CHACON (ELDREDGE v.). See Case No. 4,329.

## Case No. 2,569.

### In re CHADWICK et al.

[5 Law Rep. 457.]

District Court, W. D. Pennsylvania. Sept., 1842.

BANKRUPTCY—ACT OF 1841—TIME OF TAKING EFFECT—WHO ENTITLED TO BENEFITS OF.

1. The meaning of the word "future," in the second section of the bankrupt act [5 Stat. 442], is future with reference to the day when the act was to take effect. See Hutchins v. Taylor [Case No. 6,953].

2. An assignment made by debtors subsequent to the passage of the bankrupt act [5 Stat. 440, c. 19], but before it was to go into operation, of all their property, in trust for certain preferred creditors, will not prevent their discharge and certificate under the act, on their voluntary petition.

In bankruptcy.

Hampton & Black, for bankrupt Chadwick.

Findly & Lowrie, for opposing creditors.

M'Candless & Black, for the bankrupt Leavitt.

Lowrie & Baird, for opposing creditors.

IRWIN, District Judge. On the 23d of October, 1841, the bankrupts, Hanson S. Chadwick and Hart A. Leavitt, merchants of the city of Pittsburgh, made an assignment of all their estate, rights and credits, to assignees, in trust for certain preferred creditors; and on the 19th and 25th of March, following, they severally presented their petitions for the benefit of the bankrupt act, and

were subsequently declared to be bankrupts. Their petitions for discharge are opposed on the ground that the assignment was voluntarily given of all their property, rights and credits, in contemplation of bankruptcy, and is therefore fraudulent and void. On the part of the bankrupts it is contended that the assignment is not embraced in the bankrupt act; that the words, "all future payments, securities," &c.. found after the enacting clause of the second section, which it is supposed to infringe, mean all payments, &c., subsequent to the time the act took effect; and that if the act does include the assignment, they are protected by the first and second provisions of the said second section. The act was passed on the 19th of August, 1841 [5 Stat. 449], and the seventeenth section declares "that this act shall take affect from and after the first day of February next." Until the time last mentioned, the act had no legal existence or power, except as to such parts of it as, in express words, are retrospective, or which declare that certain provisions shall take effect from "and after the passage of the act." The rights which it creates, its disabilities, and obligations began on the 2d day of February. 1841, except where it otherwise provides in words, the import of which cannot be mistaken, as in the retrospective clause of the second section, which prevents the discharge of a bankrupt, who has made an assignment with preferences, subsequent to the first of January, 1841, or at any other time, in contemplation of the passage of a bankrupt law, unless assented to by a majority in interest of the unpreferred creditors, and in that part of the 4th section which declares that the bankrupt shall not be entitled to a discharge and certificate "who shall not have kept proper books of account, after the passage of this act, nor any person who, after the passage of this act, shall apply trust funds to his own use." These words are not found in any other part of the act, from which it may be inferred that. where congress, in any other case, intended to give the act effect from its passage, the same language would have been used; yet, if equivalent words are used, and the context and the scope of the act indicate the same purpose, they must receive the like construction. One leading and important object of the act is to place the creditors of a bankrupt upon an equality in the distribution of his assets; and to effect this, in the first section, "any fraudulent conveyance, assignment," etc., is made an act of bankruptcy, and in the second section, all "payments, securities," etc., with preferences, in contemplation of bankruptcy, are declared to be a fraud upon the act. The words "any fraudulent conveyance," &c., in the first section, embrace the fraudulent acts mentioned in the second section, and they are alike void, and a fraud upon the act, and subject to the same action in case of both voluntary and involuntary bankruptcy. They are, with the other enumerated cases in the first section, acts of bankruptcy It has become material to inquire, from what time they are so? No argument need be used to show that the "persons liable to become bankrupts within the true intent and meaning of the act," are only such as committed acts of bankruptcy from the time it took effect. This is too obvious to be denied. The great aim and object of the law is to declare what shall be acts of bankruptcy, and who are to be bankrupts; all the rest is but details of proceedings in bankruptcy, and these proceedings must necessarily begin to operate at the time when the subject matter of them can be reached. Unless, therefore, an exception is made of a particular class of bankrupts, whose acts are void, from the passage of the law, there can be no decree of bankruptcy made which will have relation back to that time. It is contended that this exception is made by a fair construction of the second section of the act; that though it may be admitted that the first four classes of persons mentioned in the first section as liable to become bankrupts could only become so after the law took effect, yet that the fifth class, such as make "any fraudulent conveyances, assignments," &c., from the natural meaning of the words "future payments," &c., in the second section, which only define the frauds referred to in the first section, must be deemed bankrupts from the passage of the act. It must be admitted, that where a statute requires something to be done in future, or forbids that which was lawful before to be done in future, and there should not be found in any other part of it language to restrict, qualify, enlarge, or show another meaning than the words naturally import, it takes effect from its passage, however inconvenient or injurious the consequences. The second section, unconnected with any other part of the act, would involve those who made "payments, conveyances, &c." in bankruptcy from the passage of the act, so that all such "payments, conveyances, &c." from that time would be fraudulent and void, and the person making them could not receive a discharge, while from the operation of the first and seventeenth sections all other acts of bankruptcy are created such at a future day, the act as to them not going into effect until more than six months from its passage. In the first section those liable to become bankrupts are ranged in classes, the fifth being such as "make any fraudulent conveyance, assignment, &c.," and but for the words "future payments, &c.," in the second section, this class as well as the first four could not be known as bankrupt before the day on which the act was to take effect. Can it be that the legislature intended to discriminate between them, so that one class should be the immediate subject of notice and punishment while the other classes are protected for more than six months longer? In the nature and in the degree of frauds

they are all placed by the statute upon the same equal ground, but they were not so before the statute was passed, for the first four always bore a character of fraud, while the fifth, as defined by the second section, makes that fraudulent which was before sanctioned by general usage among merchants and by the laws of the state. It might be supposed therefore, that if it was designed to apply the law to one act of bankruptcy at one period, and to another at a later period, the longest notice was due to the persons whose assignments and transfers, by long usage and the statutes of several of the states—Pennsylvania among the number—were valid and sometimes meritorious, and who, if the bankrupt law took effect from its passage, could not in distant parts of the union, and after they had made bona fide transferances of property, know that they had subjected themselves to its provisions. It is a mistake to suppose that such assignments had any character of fraud.

In the case of Brashear v. West, 7 Pet. [32 U. S.] 614, Chief Justice Marshall says, "that a general assignment of all a man's property is, per se, fraudulent, has never been alleged in this country; the right to make it, results from the absolute ownership which every man claims over that which is his own, and where no bankrupt law exists for setting aside a deed honestly made for transferring the whole of a debtor's estate for the payment of his debts the preference given to favored creditors, is the exercise of a power resulting from the ownership of property which the law has not yet restrained. It cannot be treated as a fraud." This doctrine had before repeatedly received the assent of the supreme court of this state. While such assignments were thus protected and were often considered as meritorious, a law that would suddenly change their character, and convert them into frauds, without promulgation, or, which is the same thing, without reasonable notice, would be harsh and unjust, and it would be going too far to attribute such an intention to the legislature, unless expressed in language free from doubt, and which could not be rationally misconstrued. Probably no statute can be found, affecting rights so pervading and important, and subjecting them to changes so material, which is made to take effect from its passage. The bankrupt act of 1800 [2 Stat. 26], contained a provision against fraudulent conveyances of property similar to that found in the existing law; but the legislature guarded against any injustice in its operation. It passed on the 4th of April, but was not to take effect until from and after the first day of June following. A statute ought to receive such a construction, if the words and subject matter will admit of it, as that the existing rights of individuals shall not be infringed; and it is a general rule in construing them, that they are to be considered as prospective, and not to prejudice or affect transac-

tions, unless such intention be manifestly expressed, especially if it tend to produce injustice or inconvenience. "Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects." U. S. v. Fisher, 2 Cranch. [6 U. S.] 390.

With regard to the first four acts of bankruptcy mentioned in the first section, no rights would be infringed, or no injustice done, if the law went into operation from its passage, for they are not protected by the usage or statute of any state; but the fifth act, so far as it relates to assignments which were not frauds per se was not repugnant to the law and usage of the state, and if the law intended to discriminate between them, as to the time of its operation upon each, the fifth would have been the last to go into effect. But it is manifest that these several acts of bankruptcy were intended to go into effect at the same time, and that that time was from and after the first day of February 1842. The fifth class includes, if not in precise words, every kind of transfer, security, gift, &c., mentioned in the first clause of the second section, and the latter part of the clause declares that "the assignee under the bankruptcy shall be entitled to claim, sue for, recover and receive the same as a part of the assets of the bankruptcy." The third section vests all the property and rights of property of the bankrupt, from the time of the decree, in his assignee, for the benefit of his creditors. Now, it is clear, that the right of the assignee to the bankrupt's property, created by the decree, in involuntary cases, cannot go farther back than the act of bankruptcy, and that that act could not be committed before the law went into operation. There is nothing in the law which designs to reach the property of the bankrupt before an act of bankruptcy; in that respect it pursues the policy of all bankrupt laws as well as the plain dictates of justice; the assignments spoken of in the second clause of the second section, made subsequent to the first of January, 1841, or at any other time, create no exception, as they are not void, but merely prevent a discharge, unless assented to by a majority in interest of the creditors not preferred.

In giving a construction, then, to the words "future payments," &c., in the second section, every part of the act is to be considered, and the intention of the legislature to be extracted from the whole; and where great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature is plain, in which case it must be obeyed. Now, it is acts of bankruptcy which the law only intends to reach; there can be no frauds upon the law but the acts themselves eo nomine, and as such acts can only happen by force of the statute, which, as has been shown, took

effect, except such parts thereof as have been before noticed, from the second day of February, the "future payments, securities, &c.," mentioned in the second section must be such as were made and given future to that day; otherwise we should involve ourselves in the anomaly of decreeing, in involuntary cases, certain matters to be frauds upon the law, which were not by any of its provisions acts of bankruptcy. If the words "future payments, &c.," should be construed to mean future to the passage of the act, in most cases the enactment would defeat itself; the debtor being then in failing circumstances, and intending to apply for the benefit of the act, would be deterred from giving preference by assignment, and his property might all be exposed to the creditor or creditors who should be most vigilant in obtaining judgments and executions. The other creditors, meanwhile, between the passage and operation of the act, could make no movement under it; and after its operation, if the judgments and executions were not by the procurement of the debtor, they would be without remedy. Where the law was intended to have effect from its passage, it employs language not to be mistaken, as in the parts quoted "from and after the passage of the act, &c." If it has been shown that there could be no act of involuntary bankruptcy until after the law took effect, the reasoning which leads to that conclusion, applies with as much force to cases of voluntary bankruptcy. The right of the creditors to the property of either bankrupt is secured by the law from the same time, and with the single exception in the last clause of the second section, which is retrospective in its effects, they are both equally subject to its provisions. There can be no reason given why the matter in dispute should apply to the one and not to the other, and none has been attempted.

Looking into every part of the act, its object and its consequences, the intention of the legislature in using the words "all future payments," &c., cannot be doubted: they must be construed to mean all payments, securities, &c., which were made and given after the act took effect. The assignment of the petitioners is therefore not embraced by the bankrupt law, and they are entitled to their discharge. Decree accordingly.